**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0635n.06

No. 08-3260

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Sep 08, 2009**
LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| **DERRICK BENNING,** | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| **WARDEN, LEBANON** | ) | SOUTHERN DISTRICT OF OHIO |
| **CORRECTIONAL INSTITUTION,** | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before: KEITH, CLAY, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Petitioner-appellant Derrick Benning appeals

from the district court's denial of his petition for a writ of *habeas corpus*. After an Ohio jury

convicted Benning of murder and felonious assault, the state trial court sentenced him to 39 years

to life in prison based, in part, on judge-found facts. The Ohio Court of Appeals affirmed Benning's

convictions and sentence, and the Ohio Supreme Court denied leave to appeal. Benning then filed

this petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern

District of Ohio, raising six grounds for relief. The district court denied the petition in its entirety.

For the reasons that follow, we affirm in part and reverse in part.

No. 08-3260
*Benning v. Warden Lebanon*
*Correctional Institution*

I.

The Court of Appeals of Ohio found the following facts:[1]

Raymone Lyons was shot and killed on a sidewalk in a "drive-by"-style shooting in the Over-the-Rhine area of Cincinnati. Rosalind Campbell and Jerry Black were also shot, though both survived. Black testified that the gunfire had come from a convertible Camaro carrying two African-American males. Another eyewitness to the shootings gave a similar description of the car and the men involved. No one, however, could positively identify Benning as one of the gunmen.

Police did not immediately apprehend Benning. Officer Kevin Hankerson testified that, shortly after the shootings, he witnessed two African-American men flee from a parked, green convertible Camaro. The men escaped, but police found a firearm, a .40 caliber Glock, approximately fifteen to twenty feet from the car in an area where one of the men was seen running. Testing later confirmed that the weapon had been used in the drive-by shootings. Inside the car, police found shell casings from a 9mm gun similar to those found at the scene, as well as shell casings fired from the .40 caliber Glock. Fingerprints lifted from the Camaro matched Benning's.[2] . . .

Aside from the foregoing evidence, the state relied heavily on the testimony of Alonzo Buchanan to prove its case. Buchanan testified that Benning and Benning's co-defendant, Ryan Lillard, had been with him for most of the night in question, but had left in Benning's green convertible Camaro for approximately an hour. According to Buchanan, when the men returned, each was holding an automatic weapon with an open slide indicating that the weapons had been fired. One of the men told Buchanan that "we might have drama." Buchanan later discovered that it was his cousin who had been shot and killed that evening. Suspecting that [Benning] and Lillard may have been involved in his cousin's death, Buchanan spoke with Lillard, who told Buchanan that "it wasn't meant." Buchanan testified that he believed this statement to mean that Benning and Lillard had not intended to kill Buchanan's cousin.

*State v. Benning* ("*Benning II*"), No. C-040636, slip op. at 1-2 (Ohio Ct. App. June 7, 2006).

---

[1]We must presume these facts are correct unless Benning rebuts that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

[2]The jury also heard evidence that Benning had been in possession of the car for several months prior to the shooting, although the car was titled in the name of Dante Rogers. *State v. Benning* ("*Benning I*"), No. B0308606-A, slip op. at 5 (Ohio Ct. Com. Pl. June 10, 2005).

Benning, along with his codefendant Lillard, was indicted for Lyons's murder and proceeded to trial. During closing arguments, the prosecutor commented that "what Alonzo Buchanan had to say to you from that witness stand was the truth." The jury convicted Benning of murder and three counts of felonious assault, as well as firearm specifications on each count, but it was unable to reach a verdict as to Lillard. Lillard later pled guilty to voluntary manslaughter and felonious assault, each with firearm specifications, and received a sentence of 13 years.

At sentencing, the trial judge made several factual findings that increased Benning's sentence above the statutory minimum. Each count of felonious assault–two against Campbell and one against Black–carried a possible term of two to eight years.[3] Benning received the maximum term of eight years on each count. In order to impose anything above the minimum sentence, the judge was required to make the specific factual findings that the shortest term would demean the seriousness of the crime and would not adequately protect the public. In order to impose the maximum sentence, the judge was required to make the further findings that Benning committed the worst form of the offense and posed the greatest likelihood of future crime. These findings were based on the judge's assessment that the drive-by shooting was a "sens[e]less act of violence" and that Benning had a "long criminal history starting when [he was a] juvenile and continuing." The judge made additional factual findings necessary to impose consecutive terms of imprisonment.[4] In

---

[3]The two counts against Campbell merged for sentencing purposes, but they did not merge with the count against Black. Therefore, the minimum sentence Benning could receive for the three counts was four years.

[4]The judge found that: (1) consecutive terms were necessary to protect the public; (2) Benning was under community control at the time of the offense; (3) the physical harm to Campbell was serious because she had a bullet remaining in her body; and (4) Benning's criminal history

total, the judge-found facts increased Benning's sentence on the felonious assault counts from the statutory minimum of four years to the maximum of sixteen years. The judge then imposed mandatory consecutive terms of three and five years for the firearm specification and because the case involved a drive-by shooting, respectively. Finally, the murder count carried a statutory term of 15 years to life, which the judge imposed. Benning received a total sentence of 39 years to life. Benning timely appealed his convictions and sentence to the Ohio Court of Appeals.

After Benning filed his notice of appeal, but before he submitted his appellate brief, he received a letter from Lillard. Lillard was then in prison, having pled guilty to reduced charges and having received a sentence of 13 years. In the letter, Lillard confessed that he and another man, Dante Rogers, had carjacked Benning and used his car to commit Lyons's murder without Benning's involvement. Based on Lillard's letter, Benning filed a motion for a new trial based on newly discovered evidence. Attached to the motion was a document captioned "Affidavit of Ryan Lillard,"[5] which restated the relevant parts of Lillard's letter to Benning and indicated that "Benning had nothing to do with this crime." The trial court found Lillard's statements to be untrustworthy because they were made after Lillard himself had been sentenced and Rogers had died. Consequently, the court found that Benning could not show that the new evidence disclosed a strong probability that it would change the result if a new trial were granted. The court also found that Lillard's statements merely impeached the evidence presented at trial, and it denied Benning's

---

showed a need to protect the public. Benning does not challenge the court's imposition of consecutive sentences based on judge-found facts. *See Oregon v. Ice*, 129 S. Ct. 711, 714-15 (2009).

[5]Lillard signed, but did not swear to, the statements contained in the "affidavit."

motion for a new trial.

Benning then filed his appellate brief, raising two issues for review: (1) his convictions were against the manifest weight of the evidence and (2) the trial court erred in denying his motion for a new trial. The Ohio Court of Appeals disagreed with the first assignment of error, finding that the government presented sufficient evidence to permit a rational trier of fact to infer that Benning was one of the two men in the Camaro. As to the second assignment of error, the court found it was without jurisdiction to review the denial of the motion for a new trial because Benning never appealed from it.

Benning, proceeding *pro se*, timely appealed to the Supreme Court of Ohio, raising eight propositions of law for review.[6] The Supreme Court of Ohio declined to accept the appeal for

---

[6]Relevant to this appeal are the following propositions of law:

II.      Where a convicted co-defendant admits his own guilt as well as his actions in setting up the defendant, it is error to refuse to conduct an evidentiary hearing on a properly filed motion for new trial, and to refuse to grant relief.

III.     Where appellate counsel makes serious errors and fails to raise significant and obvious issues of constitutional magnitude with reasonable probability of success on appeal in favor of weaker arguments with little or no chance of success, the appellant has been denied the effective assistance of counsel on direct appeal, in violation of the Sixth and Fourteenth Amendments, and Article One, sections ten and sixteen of the Ohio Constitution, requiring reversal.

V.       Where trial counsel . . . fails to object to prosecutorial misconduct in closing arguments, . . . the defendant has been denied the effective assistance of counsel under the state and federal constitutions.

VI.      Where a prosecutor . . . conducts improper vouching for state witnesses to the jury, the defendant is denied due process of law.

review. *State v. Benning*, 855 N.E.2d 496 (Ohio 2006) (table).

Benning then filed this petition for a writ of *habeas corpus* in the United States District Court for the Southern District of Ohio, raising six grounds for relief. The district court denied the petition, granted Benning a certificate of appealability ("COA") on his claims "that it was ineffective assistance of appellate counsel to fail to raise a *Blakely* claim on direct appeal and [to fail] to claim ineffective assistance of trial counsel for trial counsel's failure to make a *Blakely* claim in the trial court," and denied a COA on all remaining claims. This court granted a COA on the additional questions "whether the prosecutor improperly vouched for a witness (Alonzo Buchanan) by stating that his testimony was true; whether trial counsel rendered ineffective assistance by failing to object to the comment; whether appellate counsel rendered ineffective assistance by failing to challenge the comment or trial counsel's failure to object on appeal; whether appellate counsel rendered ineffective assistance by failing to appeal the denial of the motion for a new trial; and whether Benning has demonstrated actual innocence."

II.

In a *habeas* case, we review the district court's legal conclusions *de novo*. *See Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008). Because Benning filed his petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See Woodford v. Garceau*, 538 U.S. 202, 204, 210 (2003). Accordingly, any factual findings made by the Ohio

---

VIII.   Where a sentence in a criminal case is enhanced beyond the statutory maximum based upon factual findings not alleged in the indictment, admitted by the defendant, or proven beyond a reasonable doubt and found by the jury, but rather were arbitrarily "found" by the judge, the defendant's Sixth Amendment right has been violated.

courts "shall be presumed to be correct," unless Benning has shown otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Although AEDPA ordinarily requires deference to the state court's legal conclusions, here the Ohio courts never passed on Benning's constitutional claims. Therefore, we review those claims *de novo*. *See Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009).

## A.

First, Benning alleges that the prosecutor's comment that Alonzo Buchanan's testimony "was the truth" violated his due process right to a fair trial. Benning concedes that this claim is not exhausted because he failed to present it to the Ohio Court of Appeals, but he contends that this default should be excused by ineffective assistance of trial and appellate counsel or, alternatively, by actual innocence. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Because none of these excuses ultimately have merit, as explained below, Benning's due process claim is procedurally defaulted. *See id.* Nonetheless, because Benning's ineffectiveness claims turn on whether the underlying due process claim has merit, we address the due process claim first. *See Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir. 2007).

## 1.

"On habeas review, 'the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process.'" *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)) (internal quotation marks omitted). This court employs a two-step analysis in determining whether prosecutorial misconduct warrants a writ of *habeas corpus*: (1) whether the prosecutor's conduct

was improper and, if so, (2) whether the improper conduct was flagrant. *Irick v. Bell*, 565 F.3d 315, 324 (6th Cir. 2009).

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also United States v. Henry*, 545 F.3d 367, 380 (6th Cir. 2008). On the other hand, a prosecutor is entitled to "argue[] that other facts in evidence support or corroborate" a witness's testimony. *See United States v. Stuckey*, 253 F. App'x 468, 489 (6th Cir. 2007).

Taken in isolation, the prosecutor's comment that Buchanan's testimony "was the truth" would be a patently improper remark indicating his belief in Buchanan's credibility. *See United States v. Manthey*, 92 F. App'x 291, 296 (6th Cir. 2004) (prosecutor's comment that witness was "telling the truth" was improper); *Shacks v. Tessmer*, 9 F. App'x 344, 349 (6th Cir. 2001) (prosecutor's comment that "that is the truth from [the government's] witness" was improper). Taken in context, however, the comment does not indicate a personal belief in Buchanan's credibility:

> [A] telephone contact between Ryan Lillard and Alonzo Buchanan can confirm to you, or some ability to confirm for you, what Alonzo is telling you is the truth. You determine the credibility of the witnesses, and you do that by comparing what they say to other facts and circumstances that are in evidence that are uncontroverted, and determine how those statements coincide with other things you've heard. . . . [F]ive times, there are outgoing and incoming calls between Ryan Lillard's phone, which you have the records of, and 238-7477, the phone linked to Alonzo Buchanan. And, in fact, at least one of those calls was a seven-minute conversation between these two phone numbers. Further evidence, further confirmation of what Alonzo Buchanan had to say to you from that witness stand was the truth about what he saw and what he observed on the night of August 6th, 2003, and the aftermath of that particular

evening.

When viewed in context, the comment was part of a permissible argument that the telephone calls corroborated Buchanan's version of events. The prosecutor did not give his own opinion as to Buchanan's credibility; instead, he took care to remind the jury that credibility was for it to decide. *See United States v. White*, 563 F.3d 184, 194 (6th Cir. 2009). We therefore conclude that the comment did not amount to impermissible vouching for Buchanan. *See United States v. Smith*, 110 F.3d 65 (6th Cir. 1997) (table) (statement that witness "told the truth" not improper vouching in context). Because the comment was not improper, we need not consider whether it was flagrant. *See United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009).

2.

Benning next claims that trial counsel's failure to object to the Buchanan comment violated his right to effective assistance of counsel. To succeed on that claim, Benning must show (1) trial counsel's performance was deficient and (2) this deficient performance prejudiced him. *See Nichols v. United States*, 563 F.3d 240, 247-49 (6th Cir. 2009) (*en banc*) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). An attorney's performance is deficient if it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In reviewing counsel's performance, this court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Deficient performance is prejudicial where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[A] failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel." *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005).

However, failure to object cannot be ineffective where the prosecutor did not act improperly. *Finkes v. Timmerman-Cooper*, 159 F. App'x 604, 611 (6th Cir. 2005); *see also Jenkins v. United States*, 394 F.3d 407, 412 (6th Cir. 2005). Because we find that the Buchanan comment was not improper, trial counsel was not ineffective for failing to object to it.

3.

Benning also claims that his appellate counsel was ineffective for failing to raise on direct appeal an ineffective assistance of trial counsel claim based on trial counsel's failure to object to the Buchanan comment. Benning "is entitled to effective assistance of counsel in connection with [his] first appeal of right," *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003), and we apply the two-pronged *Strickland* test to evaluate appellate counsel's representation. *See Mapes v. Tate*, 388 F.3d 187, 191 (6th Cir. 2004). The ultimate question is whether inclusion of the omitted issue on appeal would have changed the result of that appeal. *Ivory*, 509 F.3d at 294. "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). Because Benning's due process and ineffective assistance of trial claims lack merit, as shown above, appellate counsel cannot be ineffective for failing to raise them on direct appeal. *See, e.g.*, *Wilson v. Mitchell*, 498 F.3d 491, 515 (6th Cir. 2007). Moreover, because appellate counsel was not ineffective, ineffectiveness cannot constitute cause for Benning's procedural default of his due process claim. *See Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005).

B.

At sentencing, the trial court made several factual findings that increased Benning's prison

term on the felonious assault counts from a possible minimum of four years to the statutory maximum of sixteen years. Benning argues that, as a result, his sentence violated his Sixth Amendment rights under *Blakely v. Washington*, 542 U.S. 296 (2004), that trial counsel was ineffective for failing to make a *Blakely* objection at sentencing, and that appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim on that ground.[7] Additionally, Benning argues that appellate counsel was ineffective for failing to argue *Blakely* on direct appeal. We address each claim in turn.

1.

As discussed above, whether appellate counsel was ineffective for failing to raise an issue on direct appeal depends on the merit of the underlying issue. Thus, if trial counsel was not ineffective for failing to make a *Blakely* objection, appellate counsel cannot be ineffective for failing to argue that he was. *See Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003). We therefore begin with the question of whether trial counsel was ineffective at sentencing.

Benning was sentenced on September 22, 2004. Three months earlier, on June 24, 2004, the United States Supreme Court issued its decision in *Blakely*, extending the reasoning of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Court had held in *Apprendi* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

---

[7]The warden argues that Benning procedurally defaulted this issue by failing to present it to the Ohio Supreme Court. A review of Benning's *pro se* brief indicates that Benning raised the following claim about appellate counsel: "[C]ounsel failed to raise *any issues about* the Batson violation, *ineffective trial counsel*, prosecutorial misconduct, unconstitutional jury instructions and *unlawful sentence enhancement, under Blakely v Washington* . . . ." Construing this *pro se* filing liberally, we find that Benning preserved this issue.

maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

Then, in *Blakely*, the Court defined "statutory maximum" as "the maximum sentence a judge may

impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."

542 U.S. at 303. As a result, the Court found that the State of Washington's mandatory sentencing

scheme violated the Sixth Amendment.

As early as July 9, 2004, Ohio's First District Court of Appeals–the district that would hear

Benning's direct appeal–held that Ohio's felony sentencing scheme, which like Washington's

depended upon judicial factfinding, did not violate *Blakely* so long as the sentence imposed fell

within the prescribed statutory range. *See State v. Bell*, 2004 WL 1531904, at *5 (Ohio Ct. App. 1st

Dist. July 9, 2004); *see also State v. Bruce*, 824 N.E.2d 609, 611 n.7 (Ohio Ct. App. 1st Dist. Feb.

4, 2005) (*per curiam*) (collecting cases). After the Supreme Court's decision in *United States v.

Booker*, 543 U.S. 220 (Jan. 12, 2005), however, the First District changed course and applied *Blakely*

to invalidate portions of Ohio's sentencing scheme. *See Bruce*, 824 N.E.2d at 610 (holding that trial

court's imposition of maximum sentence based on judicial factfinding that defendant committed the

"worst form of the offense" violated *Blakely*); *State v. Montgomery*, 825 N.E.2d 250, 253 (Ohio Ct.

App. 1st Dist. Mar. 11, 2005) (holding that trial court's imposition of a nonminimum sentence based

on judicial factfinding violated *Blakely*). Most of Ohio's other appellate districts, however,

concluded that *Blakely* was inapplicable. *State v. Foster*, 845 N.E.2d 470, 487-88 & nn.78-82 (Ohio)

(collecting cases from other appellate districts finding that *Blakely* was inapplicable), *cert. denied*,

549 U.S. 979 (2006). The Ohio Supreme Court ultimately agreed with the First District, holding on

February 27, 2006, that Ohio's sentencing scheme violated the Sixth Amendment. *Foster*, 845

N.E.2d at 494. The court's remedy was to sever the unconstitutional portions of the felony sentencing statutes, with the result that "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Id.* at 498; *see also State v. Payne*, 873 N.E.2d 306, 311 (Ohio 2007) (noting that "*Foster* represents a Pyrrhic victory" for defendants because "trial courts no longer must navigate a series of criteria that dictate the sentence").

Strickland requires this court to evaluate trial counsel's performance "from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001). Therefore, the question is whether it was reasonable to fail to make a *Blakely* objection on September 22, 2004, in Ohio's First District. Three months earlier, on July 9, 2004, the First District had held that *Blakely* did not invalidate Ohio's felony sentencing scheme. The law was rapidly changing, however, and the impact of *Blakely* was far from certain. *See Foster*, 845 N.E.2d at 487-88 & nn.76-82 (collecting cases from the Ohio appellate courts applying *Blakely* with differing results); *cf. United States v. Koch*, 383 F.3d 436, 438 (6th Cir. Aug. 26, 2004) (*en banc*) (pre-*Booker* decision noting circuit split on the question of whether *Blakely* invalidated the Federal Sentencing Guidelines). Although prudent counsel would have preserved a *Blakely* claim under these circumstances, counsel's failure to anticipate that *Foster* would overrule binding First District precedent was not constitutionally unreasonable. *See Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999). As in *Lucas*, Ohio courts "continued to grapple with the problem," and thus resolution of the issue was "not clearly foreshadowed" at the time of trial. *Id.* Therefore, this

is not "one of those 'rare cases' for finding ineffective assistance because [trial counsel] failed to anticipate a development in the law." *Id.* Because trial counsel was not ineffective, it follows that appellate counsel cannot be ineffective for failing to raise ineffective assistance of trial counsel on direct appeal.

2.

Additionally, Benning claims that appellate counsel was ineffective for failing to raise a *Blakely* claim on direct appeal. To establish deficient performance, Benning must show that the claim not presented (*i.e.*, *Blakely*) was clearly stronger than the issues counsel did present. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). The only issue that appellate counsel properly preserved and briefed was insufficiency of the evidence–a claim that Benning aptly described in his *pro se* brief as a perennial loser. By contrast, *Blakely* had developed into a winning argument. Between September 22, 2004, when Benning was sentenced, and October 25, 2005, when counsel filed his appellate brief, several important changes in the law occurred. On January 12, 2005, the Supreme Court handed down its decision in *Booker*. Then, in February and March of 2005, Ohio's First District began applying *Blakely/Booker* to invalidate portions of Ohio's felony sentencing scheme. *See Bruce*, 824 N.E.2d at 610; *Montgomery*, 825 N.E.2d at 253. By the time counsel filed his appellate brief in October of 2005, then, the First District had already concluded that the sentencing statutes used to enhance Benning's sentence were unconstitutional. Under these circumstances, the *Blakely* claim was clearly stronger than the insufficiency of the evidence claim, and it was unreasonable for appellate counsel to fail to raise it.

Benning must also show prejudice, which in this context means "a reasonable probability that

inclusion of the [*Blakely*] issue would have changed the result of the appeal." *See Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008) (quoting *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004)). The warden argues that Benning has not satisfied the prejudice prong because he cannot show a reasonable probability that he would have received a shorter sentence on remand. This argument misunderstands the prejudice inquiry. When confronting a claim of ineffective assistance of *appellate* counsel, *Strickland* requires us to ask whether there is a reasonable probability that Benning "would have prevailed on appeal." *Smith*, 528 U.S. at 285; *McFarland*, 356 F.3d at 700. The question, then, is whether there is a reasonable probability that the appeal would have resulted in a remand, not whether the remand would have resulted in a shorter sentence. With the inquiry properly framed, we turn to the events surrounding Benning's appeal.

Benning's appellate brief was filed on October 25, 2005, and the First District affirmed his convictions on June 7, 2006. In the interim, on February 27, 2006, the Ohio Supreme Court struck down the felony sentencing statutes used to enhance Benning's sentence as unconstitutional. *See Foster*, 845 N.E.2d at 494. The *Foster* court decided that the proper remedy was to sever the unconstitutional portions of the sentencing statutes and remand all cases "on direct review . . . to trial courts for new sentencing hearings." *Id.* at 499; *see also State v. Silsby*, 894 N.E.2d 667, 668 (Ohio 2008). Benning's case was pending on direct review before the First District when *Foster* was decided. Therefore, if counsel had briefed the *Blakely* issue, Benning would have been entitled to a remand for resentencing under *Foster*.

There is a wrinkle in this analysis: *Payne*. In *Payne*, the Ohio Supreme Court held that defendants who were sentenced after *Blakely* and who failed to make a *Blakely* objection at

sentencing "forfeited" that claim on direct appeal. 873 N.E.2d at 310. Consequently, *Payne*

instructed the Ohio courts of appeals to review such cases only for plain error. *See id.* at 311. The

*Payne* court noted that plain error will ordinarily be difficult for defendants to demonstrate because,

under *Foster*, "nothing . . . hinder[s] the trial court from considering the same factors it previously

had been required to consider and imposing the same sentence or even a more stringent one." *See*

*id.* Therefore, had Benning's direct appeal been decided after *Payne*, he would most likely not be

entitled to resentencing because he forfeited the *Blakely* issue by failing to raise it before the trial

court.

Once again, timing is key. Benning's direct appeal was decided more than a year *before*

*Payne*. *Payne* was not decided until September 26, 2007, nineteen months after *Foster*. *Foster* itself

was silent on the issue of forfeiture and, in the interim months before *Payne*, "[r]esentencing [was]

conducted in hundreds of criminal cases around the state based on the *Foster* directive." *Payne*, 873

N.E.2d at 314 (Cupp, J., concurring in part and dissenting in part); *see also id.* at 308-09 (majority

opinion). Therefore, had appellate counsel raised *Blakely* on direct appeal, there is a reasonable

probability that the First District would have remanded the case for resentencing pursuant to *Foster*,

situating Benning among the "hundreds" of criminal defendants who were resentenced pursuant to

*Foster* but prior to *Payne*.[8]

---

[8]*See, e.g.*, *State v. Bevins*, 2006 WL 3825141, at *7 (Ohio. Ct. App. 1st Dist. Dec. 29, 2006) (remanding in light of *Foster* without considering issue of forfeiture); *State v. Reid*, 2006 WL 3524423, at *7 (Ohio Ct. App. 1st Dist. Dec. 8, 2006) (same); *State v. Martin*, 2006 WL 2846289, at *4 (Ohio Ct. App. 1st Dist. Oct. 6, 2006) (same); *State v. Earls*, 2006 WL 2237793, at *1 (Ohio Ct. App. 1st Dist. Aug. 4, 2006) (same); *State v. James*, 2006 WL 1360507, at *9 (Ohio Ct. App. 1st Dist. May 19, 2006) (same); *State v. Mozena*, 2006 WL 664157, at *2 (Ohio Ct. App. 1st Dist. Mar. 17, 2006) (same); *State v. Byrd*, 2006 WL 664164, at *2 (Ohio Ct. App. 1st Dist. Mar. 17, 2006)

Because Benning has shown both deficient performance and prejudice, appellate counsel was ineffective for failing to raise a *Blakely* claim on direct appeal. Consequently, we find that Benning is entitled to *habeas* relief on this ground.

C.

Benning also argues that appellate counsel was ineffective for failing to appeal the denial of his motion for a new trial. As with his other ineffectiveness claims, to succeed Benning must show *both* deficient performance and prejudice. *See Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008). Here, trial counsel's performance was deficient. The trial court's denial of the motion for a new trial was one of only two issues included in counsel's appellate brief, yet counsel inexplicably failed to file a notice of appeal from the pertinent order, depriving the court of jurisdiction over that issue. This cannot be a strategic choice protected by *Strickland*.

Because Benning has shown deficient performance, this court must determine whether counsel's unprofessional error prejudiced Benning. To establish prejudice, Benning must show "a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard*, 405 F.3d at 485. Had counsel properly preserved the issue, the Ohio Court of Appeals would have reviewed it for abuse of discretion. *See State v. Schiebel*, 564 N.E.2d 54, 62 (Ohio 1990). Under Ohio law, "abuse of discretion" means "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 450 N.E.2d 1140, 1142 (Ohio 1983) (citations omitted).

Ohio courts use a six-factor test to determine whether a new trial is warranted on the basis

(same); *State v. Stafford*, 2006 WL 571873, at *1 (Ohio Ct. App. 1st Dist. Mar. 10, 2006) (same).

of newly discovered evidence, namely, whether the evidence:

(1)     discloses a strong probability that it will change the result if a new trial is
        granted,
(2)     has been discovered since the trial,
(3)     is such as could not in the exercise of due diligence have been discovered
        before the trial,
(4)     is material to the issues,
(5)     is not merely cumulative to former evidence, and
(6)     does not merely impeach or contradict the former evidence.

*State v. Hawkins*, 612 N.E.2d 1227, 1235 (Ohio 1993) (paragraph breaks inserted).  The state

conceded before the trial court that factors two through five were met, but it argued that Benning

could not meet factors one and six, and the trial court agreed.  Relying on *State v. Tolbert*, 1997 WL

762027, at *3 (Ohio Ct. App. Dec. 12, 1997) (*per curiam*), the court found that Lillard's "late-

coming statements" were "analogous" to recanted testimony.  Consequently, the court found that

Lillard's statements were untrustworthy.  Moreover, in light of the other evidence against Benning,

the court reasoned that Lillard's statements were unlikely to change the result.  The court also found

that the new evidence merely impeached the evidence presented at trial and thus did not meet the

sixth factor.

In deciding the motion for a new trial, the trial court was entitled to "weigh the credibility

of affidavits" based on "all relevant factors," including the court's own credibility determinations

made at trial.  *State v. Taylor*, 2007 WL 613894, at *2 (Ohio Ct. App. Mar. 1, 2007).  Here, the trial

court found that Lillard's statement was inherently untrustworthy because it was made after both

Lillard and Rogers, whom the statement implicated in the shooting, were beyond the reach of

prosecution.  This credibility determination–which was within the discretion of the trial court–led

to the conclusion that the new evidence did not disclose a strong probability that, if retried, Benning would be acquitted. Consistent with this conclusion, other Ohio courts have affirmed the denial of a motion for a new trial where the newly discovered evidence consists of a codefendant's statement assuming full responsibility for the crime. *See, e.g.*, *State v. Scott*, 2007 WL 416700, at *4 (Ohio Ct. App. Feb. 8, 2007); *State v. Kelly*, 2000 WL 1471063, at *1-2 (Ohio Ct. App. Oct. 4, 2000); *State v. Rife*, 1980 WL 353747, at *5 (Ohio Ct. App. Oct. 9, 1980). Against this backdrop of Ohio case law, Benning cannot establish that the judgment of the trial court was wrong, let alone "unreasonable, arbitrary or unconscionable." *Blakemore*, 450 N.E.2d at 1142; *cf. United States v. Barlow*, 693 F.2d 954, 965-66 (6th Cir. 1982) (finding no abuse of discretion where trial court denied motion for a new trial based on codefendant's letter accepting full responsibility for the crime of conviction). Therefore, Benning cannot show a reasonable probability that the Ohio Court of Appeals would have reversed the judgment of the trial court.

Alternatively, Benning asserts that the Ohio Court of Appeals would have remanded the case for an evidentiary hearing. The decision whether or not to hold an evidentiary hearing on a motion for a new trial is within the discretion of the trial court. *See State v. Smith*, 506 N.E.2d 1205, 1207 (Ohio Ct. App. 1986). Because the court previously had the opportunity to observe Lillard's demeanor at trial, it acted within its discretion in finding the new statements unreliable without holding an evidentiary hearing. *See State v. Solether*, 2008 WL 4278210, at *4 (Ohio Ct. App. Sept. 19, 2008).

In sum, Benning has not shown a reasonable probability that the Ohio Court of Appeals would have reversed the judgment of the trial court or remanded his case for an evidentiary hearing.

Therefore, he has not established prejudice and cannot show that appellate counsel was ineffective for failing to appeal the denial of his motion for a new trial.

D.

Finally, Benning claims that he is actually innocent of the shootings, thereby excusing the procedural default of his constitutional claims. *See Schlup v. Delo*, 513 U.S. 298, 315-16 (1995). To succeed on this theory, Benning must show that "it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *See Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005). This requires him "to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup*, 513 U.S. at 324. Although this standard "does not require absolute certainty," it "is demanding and permits review only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted).

Benning contends that the Lillard affidavit constitutes "new reliable evidence." The affidavit was based on a letter Lillard wrote to Benning after Lillard pled guilty and implicated Lillard and a third man, Rogers, in the crime; Rogers was now dead. In assessing the reliability of newly discovered evidence, this court "may consider how the timing of the submission and the likely credibility of the affiant[] bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332. Here, Lillard wrote the letter only after he had accepted a plea bargain and Rogers had died. The timing is therefore "highly suspect" because the letter inculpated two men who were shielded from prosecution at the time it was written. *See In re Byrd*, 269 F.3d 585, 606 (6th Cir. 2001) (collecting cases) (timing was suspect where codefendant's affidavit was submitted only after he was

convicted); *see also Allen v. Yukins*, 366 F.3d 396, 405 (6th Cir. 2004) ("[P]ostconviction statements by codefendants are inherently suspect because codefendants may try to assume full responsibility for the crime without any adverse consequences."). For the same reasons, Lillard is not credible. Therefore, Benning's proffered newly discovered evidence is not sufficiently reliable to have, more likely than not, changed the outcome of the trial. *See Allen*, 366 F.3d at 405-06; *Byrd*, 269 F.3d at 605. As a result, actual innocence cannot serve as an excuse for the procedural default of Benning's constitutional claims.

III.

For the foregoing reasons, we reverse the judgment of the district court with respect to Benning's claim that appellate counsel was ineffective for failing to raise *Blakely* on direct appeal and remand with instructions to enter a conditional writ of *habeas corpus* giving the State of Ohio 180 days to resentence Benning or release him. We affirm the judgment of the district court with respect to the remainder of Benning's claims.